# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LEONARDO CATANIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY | ) ) | Case No. 11 C 4675 |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Claimant Leonardo Catania brings this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits. Catania asks the court to reverse the Commissioner's decision, grant summary judgment in his favor, and remand the case for an award of benefits. Alternatively, he asks the court to reverse the decision and remand for further proceedings. For the reasons stated below, Catania's motion for summary judgment is denied, but Catania's alternative motion to remand the case to the Social Security Administration ("SSA") for further proceedings is granted.

### I. PROCEDURAL HISTORY

Catania filed an application for disability benefits on May 5, 2008, alleging a disability onset date of March 19, 2008. The claim was denied by the SSA on September 17, 2008. After a hearing held on February 8, 2010, Administrative Law Judge Patrick Nagle ("the ALJ") denied Catania's application on June 18, 2010. The Appeals Council denied Catania's request for

review on May 27, 2011, making the ALJ's decision the final decision of the Commissioner. Catania filed a complaint with this court on July 11, 2011.

In support of his motion for summary judgment, Catania raises the following points of argument:

1. The ALJ committed reversible error by finding that Catania's physical impairments did not meet the requirements of Listing § 1.04(A), which would have require a finding of disability.

2. The ALJ erred in failing to accommodate Catania's moderate difficulties in concentration, persistence, and pace in the residual functional capacity findings.

3. The ALJ did not accommodate Catania's moderate difficulties in getting along with others in the residual functional capacity findings.

4. The ALJ did not consider the impact of Catania's obesity on his functional capacity, nor did the ALJ consider the combined impact of all of Catania's impairments.

5. The ALJ failed to properly consider Catania's severe bilateral carpal tunnel syndrome.

6. The ALJ did not properly evaluate Catania's complaints of fatigue and need to move around to reduce his pain.

## II. Factual Background[1]

### A. Hearing Testimony

Catania testified at the hearing before the ALJ on February 8, 2010. He testified that he had been unable to work at his most recent job, delivering newspapers, since March 2008, due to "shooting" pain in his legs, buttocks, sides, and hands, and numbness in his left leg and knees. He had difficulty getting in and out of his car. (R. 32.) He had previously torn the ACLs in both of his knees. He had been treated with physical therapy and medication for his back pain. Catania testified that he was unable to perform his past work as a machinist and machine operator because he could neither stand nor sit for very long. He had to lie down during breaks.

---

[1] All cites to record evidence (R. __.) are to the Certified Administrative Record.

(R. 34-35.) In or around April 2008, he had experienced pain in his calves, and he subsequently had vein surgery on both legs. He also has arthritis in his knees. He has held off on further treatment for his veins and knees because of his hip and back issues. (R. 35-36, 38.) Catania had a total hip replacement on October 20, 2009. (R. 36.) A doctor recommended that he have an epidural for his back, which he had not yet obtained. (*Id.*) At the time of the hearing, Catania testified that he could not yet walk normally after his hip surgery and that he continued to have back pain. (R. 40.) He did not sleep well because of sleep apnea and had to sleep using a continuous positive airway pressure ("C-PAP") machine. (R. 41.)

Catania testified that he was still in therapy for his hip and planned to get an epidural for his back. (R. 45.) He had numbness and pain in his hands, and carpal tunnel surgery had been recommended. He was reluctant to have surgery on his hands and wrists at the time of the hearing because, while recovering from the hip operation, he needed his hands to use a walker and to get up from the toilet. (R. 46.) He had difficulty gripping things and writing and had weakness in his fingers. (R. 49-50.) He felt a "shock" through his hands when touching items or grabbing items, especially in his right hand. (R. 52.) He could not use his hands to hold his children, but had to cradle his infant in his arms instead. (R. 53.)

Regarding his daily activities, Catania testified that he had two children, who at the time of the hearing were three years old and three months old. (R. 42.) He usually slept during the day for two hours, or for as long as caring for his baby would permit. He was able to carry the infant down the stairs using his arms and to take the other child to preschool. He had difficulty sitting long enough to hold the infant to feed it milk, but instead had to lay the baby down on the couch to feed it. (R. 43.) He fed the children cereal and heated food in the microwave, changed the baby, and watched television. (R. 44.) He could not do household cleaning or lawn care.

3

(R. 45.) His wife took care of laundry and other household chores. He could "very occasionally" do the grocery shopping, but only by sitting in an electronic cart. (R. 44.)

Catania testified that he was depressed but had not seen a doctor for depression and had not been given medication for depression. (R. 51.) He also testified that he took medication that caused him ringing in the ears, upset stomachs, and heartburn, and that he was "cloudy" and forgetful. (R. 50.)

Vocational Expert Michelle Peters ("the VE") testified that Catania's previous job skills as a machinist and machine operator were not transferable to a position at a sedentary functional-capacity level. (R. 56.) She testified that, for an individual with a high school education and Catania's job profile, who could lift and carry up to ten pounds at a time; could sit for approximately six hours of an eight-hour day; could only occasionally climb ramps or stairs, balance, stoop, or crouch; could not climb ladders, ropes or scaffolds, or kneel or crawl; and who was limited to simple, routine, repetitive work with frequent reaching and fingering of the right hand, there would be 1000 sorter, 1200 inspection, 1500 assembly, and 1300 hand-packaging positions in the Chicago and metropolitan area. (R. 57.)

The VE testified that with the added limitation of having to alternate sitting and standing at will, there would be "approximately 50 percent of the original numbers" of jobs. If the further limitation were added that an individual could only occasionally—rather than frequently—reach or finger with the dominant right hand, all the jobs would be eliminated. (R. 58.) Were the individual unable to maintain a task performance of 80 percent given a lack of concentration due to pain, or were the individual to need to rest or lie down during the day, all of the positions would also be eliminated. (Tr. 59-60.)

**B. Medical Evidence**

Catania is 5'10" and weighs 304 pounds. (R. 158.) He suffered an injury in July 2005 while working as a machine operator and was treated for back pain. (R. 263.). In the past, he has torn both of his ACLs, and he underwent knee surgery in January 2006, which was followed by physical therapy. (R. 251-55.)

    1. Dr. Andreshak

Notes submitted by Dr. John Andreshak of OAD Orthopaedics, LTD, begin in 2005 and end in 2008. (R. 280-94.) The notes indicate that Catania injured his back in a workplace accident on July 12, 2005. (R. 287.) On March 29, 2006, Dr. Andreshak reported that Catania needed to see a hand surgeon for his carpal tunnel syndrome. In Dr. Andreshak's opinion, Catania would require spinal fusion surgery if his back got worse. As of March 2006, his leg strength was normal, and his lumbar strain and spondylolisthesis (displaced vertebra) had "basically resolved." (R. 280.)

Catania returned to see Dr. Andreshak in 2008. Notes from March 21, 2008, indicate that Catania's condition had "deteriorated." (R. 293.) They state that Catania "returns today with continued back pain. He never had complete resolution of his pain. . . . He has had gradual worsening of his back pain over time. . . . He continues to have some shooting into the left back and buttock, and some pain in the left leg. He has difficulty sitting, standing, the only comfortable position is lying down." (R. 292.) The notes further state that Catania's gait was antalgic, and that toe and heel walking was painful. A straight leg raise test (used to test for a herniated disc) was positive on the left leg. (R. 291-92.)

On March 26, 2008, notes from an exam of Catantia's spine reported "grade I-II anterolisthesis, callus formation, moderately severe bilateral posterior facet degenerative change,

and severe left posterior facet degenerative change of the L3-4." (R. 288.) A report from an MRI dated March 28, 2008, stated, "The patient has some degenerative disk disease at L3-4. He has a spondylolisthesis, grade 1 of L5-S1 with foraminal stenosis, much worse on the right side than the left. . . . Recommendation will be to try epidural injections, and if this fails, he will need surgery." (R. 291.) In a phone call to Catania on April 1, 2008, epidural steroid injections were recommended. (R. 290.) Notes from August 6, 2008, indicated that Catania's worker's compensation claim was disputed and that he had not had the epidural injections. (R. 330.)

2. Dr. Sumida

Catania was examined by Dr. Colin Sumida on June 3, 2008, and diagnosed with venous insufficiency and limb pain. He had peripheral edema in his ankle and variscosities, aching, cramping, and burning in his lower extremities due to venus insufficiency. Laser ablation was recommended. (R. 302-06.) Catania underwent laser therapy on his left leg which healed well, according to a September 23, 2008, exam, but he was going to have his left hip replaced before further treatment. (R. 426.) Additional treatment was performed on the right leg, and on January 6, 2009, Catania reported that his legs were feeling better. (R. 429.) At a six-month follow-up on August 11, 2009, notes indicated that Catania's legs had healed up well, but that Catania reported pain in his right ankle. (R. 432.)

3. Dr. Rezin

Dr. Keith Rezin examined Catania regarding his hip pain on September 3, 2008. His notes indicate that Catania had difficulty walking and had an obviously decreased range of motion in his hip; he needed a hip replacement. He also had some "degenerative type changes in the back." (R. 365.)

4. Dr. Major

Chiropractor Dr. Charles Major treated Catania for back pain. According to treatment notes dated between September 30, 2008, and July 28, 2009, Catania presented with constant sharp pain that was consistent all day. He experienced moderate pain while sitting to standing, carrying, reading, and doing chores, and he could do chores, sit and stand at "60% of normal." He experienced severe pain when lifting, bending, walking, and running, and he could not do these activities. (R. 370.) The notes indicated that during the time period covered, Catania experienced an improvement to "80% of normal" in sitting and standing, but he remained in consistent pain. (R. 375.)

5. Dr. Andersson

Catania was referred to Dr. Gunnar Andersson for an evaluation in relation to a disputed worker's compensation claim. Dr. Andersson's opinions related to whether Catania's condition was related to the workplace injury suffered in July 2005. He examined Catania on July 1, 2008. Dr. Andersson noted that epidural injections had been recommended but not authorized. (R. 313.) Catania had an antalgic gait and could walk unassisted. He had normal posture, decreased range of motion in the lumbar spine, and a negative straight leg raise test. He had severe osteoarthritis of the left hip and a grade 1 spondylolistheis of the spine. Dr. Andersson opined that Catania's hip osteoarthritis should be addressed first. He recommended that Catania return to work. He would at first be restricted to occasional lifting of 50 pounds for about 4-6 weeks, at which point he could work without restrictions.

6. Dr. Brauer & Dr. Brister

Dr. John Breuer evaluated Catania's mental status in relation to his disability claim. A report dated September 11, 2008, states that Catania reported depression but was not in

treatment. (R. 334-35.) Catania was unable to do most chores, and relied on his wife to manage the funds of the household. He reported some anxiety being around other people and out in crowds. (R. 335.) His concentration and attention were grossly intact. (R. 336.)

A psychiatric review of the record completed by Dr. Brister, a state agency psychologist, reported that Catania suffered from adjustment disorder, mild restriction of daily living activities and social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and moderate limitations in his ability to work in proximity or coordination with others without being distracted by them. (R. 341-52.)

    7. Dr. Templin

Catania was treated by Dr. Cary Templin of Hinsdale Orthopaedic between May 22, 2009, and July 6, 2009, for low-back pain. Progress notes dated June 9, 2009, stated that Catania was morbidly obese and reported low-back pain of level 4/10 in severity, which got worse when ambulating. He had a negative straight leg raise test. (R. 453.) An MRI showed that there were "degenerative changes throughout his lumbar spine." The "more pressing issue" was Catania's hip. Dr. Templin did not feel that the spinal condition limited Catania's ambulation to 200 feet, and stated that he would not qualify for a handicapped parking placard on that basis, but added that he could not speak to whether Catania's hip further limited his ambulation. (*Id*.) Dr. Templin did not feel that Catania had a permanent long-term disability but believed that a short-term disability was possible. (R. 454.) He gave Catania a prescription for physical therapy. On a questionnaire, Catania reported being unable to walk more than 100 yards, being unable to walk without a stick or crutches, and being unable to sit or stand for more than ten minutes at a time. (R. 458.)

8. <u>Dr. Daley</u>

Dr. Robert Daley treated Catania for his hip. Notes from July 6, 2009, state that the majority of Catania's symptoms appeared to be coming from his left hip; he was having significant difficulty ambulating. He needed to lose weight in order to have hip replacement surgery. (R. 476.) Although weight loss was unsuccessful, he was later scheduled for hip replacement surgery, which was performed on October 20, 2009. (R. 524, 534.) He went to physical therapy after the surgery. Notes from his physical therapy visits indicate that he used a walker at his last recorded appointment, on January 4, 2010. (R. 557.)

9. <u>Dr. Cohen</u>

Dr. Michael Cohen evaluated Catania on August 27, 2009, for bilateral hand numbness. His notes indicated that Catania had a "several year history of bilateral hand numbness and tingling, worse on the right," and that he was to be fitted for splints. (R. 492.) Catania returned for a follow-up on September 8, 2009, after an electromyogram (EMG), which showed bilateral carpal tunnel syndrome that was much worse on the right. Dr. Cohen recommended a carpal tunnel release, with the right side to be done first. (R. 494.)

10. <u>Physical Residual Functional Capacity Assessment</u>

A Physical Residual Functional Capacity Assessment completed on September 17, 2008, by Dr. Towfig Arjmand, a state agency medical consultant, stated that Catania could stand or walk or sit for about six hours in an eight-hour workday, could push or pull, and had no manipulative limitations. (R. 346-63.) Additional notes stated that Catania was obese and suffered from grade 1-2 spondylolisthesis and severe osteoarthritis of the left hip. (R. 363.)

## C. The ALJ's decision

Determining whether an individual is disabled requires the ALJ to undertake a five-step sequential evaluation process. 20 C.F.R 404.1520(a). The ALJ must determine 1) whether the claimant is engaging in substantial gainful activity, 2) whether the claimant has a medically determinable impairment or combination of impairments that is "severe," 3) whether the impairment meets or medically equals the criteria of an impairment listed in the regulations (if so, the claimant is disabled), 4) whether the claimant has the residual functional capacity to perform his past relevant work, and 5) whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. *Id*; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The Social Security Administration bears the burden of providing evidence that work exists in the national economy that the claimant can do. *Roddy v. Astrue*, ___F.3d ____, 2013 WL 197924, at *4 (7th Cir. Jan. 18, 2013).

In this case, the ALJ determined at steps one and two that Catania had not engaged in substantial gainful activity since March 19, 2008, and had severe impairments due to back pain, arthritis, depression, obesity, a left hip replacement, sleep apnea, and right hand numbness. (R. 12.) At step three, the ALJ determined that the physical impairments did not meet or medically equal one of the impairments listed in the regulations, specifically in Listings §§ 1.04, 1.02A, and 1.03. The ALJ further concluded that Catania's mental impairments did not equal the criteria of Listing § 12.04, because the restrictions and difficulties resulting from his mental impairments were mild to moderate, rather than "marked" or extreme. (R. 12-13.) The ALJ next determined that Catania's residual functional capacity was to perform sedentary work, with an option to alternate sitting and standing at will, with frequent reaching and fingering with the right hand, and limited to simple, routine, and repetitive tasks due to the lack of concentration caused

by pain medications and poor sleep. (R. 14.) At step four, the ALJ concluded that Catania could not return to his past relevant work as a machinist and machine operator. (R. 20.) The ALJ concluded at step five that jobs existed in the national economy that Catania could do: as a hand packager, sorter, inspector, or assembler. (R. 21.) The ALJ therefore concluded that Catania was not disabled.

### III. STANDARD OF REVIEW

A claimant is entitled to disability benefits if he can prove he is "under a disability," meaning he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques;" without medical evidence, the ALJ will not consider an individual to have a disability. *Id.* §§ 423(d)(3), (5).

At the federal district court level, the Social Security Act permits claimants to argue that the factual determinations made by the Administrative Law Judge (ALJ) who decided the case are not supported by "substantial evidence." 42 U.S.C. § 405(g). The district court must review the administrative record to determine whether there was a reasonable factual basis for the denial of benefits. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The court cannot decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Id.* Although the ALJ is not required to mention every piece of evidence, the ALJ must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled, so that the court "may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Id.* at 1002.

## IV. ANALYSIS

### A. Listing § 1.04(A) (Disorders of the Spine)

Catania first argues that the record demonstrated that his condition met the requirements of Listing § 1.04(A) and therefore required a finding of disability. The ALJ found, at step three of the sequential evaluation process, that Catania's physical impairments did not meet the requirements of the listing. The listing states:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulpus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

The ALJ stated that Catania's physical impairments did not meet or medically equal the listing. (Tr. 12.) In the section of the opinion stating this conclusion, however, the ALJ offered no analysis whatsoever as to why the listing was not met.

Later in the opinion, the ALJ summarized the various reports from physicians who had treated Catania for back pain, as part of his analysis of Catania's residual functional capacity. The ALJ stated that Catania was diagnosed by Dr. Andreshak on March 21, 2008, with low-back pain and acquired spondylolisthesis. The ALJ summarized Dr. Andreshak's statements that Catania continued to have pain, had some degenerative disc disease and needed epidural injections or surgery. (Tr. 16.) The ALJ did not mention that Catania had a positive straight leg

raise test.  The ALJ then discussed the evaluation of Dr. Andersson on July 1, 2008, noting that Catania had been off work since March 2008 for low-back complaints and took Aleve and Tylenol for pain.  He had an antalgic gait and could walk unassisted.  He had normal lumbar lordotic back posture with no significant tenderness.  A straight leg test was negative.  He had osteoarthritis of the spine and spondylolisthesis.  Dr. Andersson noted that there was no evidence of radiculopathy, a herniated disc, or spinal stenosis, although there were degenerative disc changes. (R. 17.)

The ALJ also summarized reports from the state agency medical consultants, including Dr. Arjmand, but stated that he "did not give them very significant weight."  (R. 17.)  He summarized the treatment notes of Dr. Major, the chiropractor, noting that in the most recent evaluation, Catania's capacity for "sitting to standing" was "80% of normal."  (*Id.*)  He summarized Dr. Templin's notes, including the fact that Dr. Templin did not feel that Catania's spinal condition so limited his ambulation that he required a parking placard and did not feel that Catania had a permanent long-term disability.  (R. 18.)  The ALJ further noted Catania's daily activities, which included child care.  (R. 18-19.)

Catania argues that the record shows that he has degenerative disc disease.  The court agrees that there is evidence in the record that could support this conclusion.  Dr. Andreshak, who treated Catania over a period of several years, stated that Catania had degenerative disc disease and required epidural injections or spinal fusion surgery.  Even Dr. Andersson, who was hired by Catania's former employer in relation to a disputed worker's compensation claim, stated that Catania had degenerative disc changes.

Whether Catania satisfied the second part of the listing ("With:  A. Evidence of nerve root compression . . .") is a closer call.  Dr. Andreshak's notes indicated that Catania had a

13

positive straight leg raise test. The ALJ did not comment on that evidence, even though Dr. Andreshak (unlike Dr. Andersson) was Catania's treating physician. The record also suggests that Catania experienced pain and limited mobility, although it is difficult to parse the symptoms caused by his back and his hip.

The court concludes that, although the ALJ summarized the record evidence, he made no logical "bridge" between the evidence and his conclusion that Catania's impairments did not satisfy Listing § 1.04(A). *See Roddy*, 2013 WL 197924, at *5. The ALJ offered absolutely nothing in the way of reasoning to explain his conclusion; he merely said that the listing was not met. (*See* R. 12.) The court cannot determine from the ALJ's opinion whether his analysis was adequate. The court therefore remands so that the ALJ may explain his finding that Catania's impairment was not of listing level severity.

On remand, the ALJ should also explain whether and how Catania's obesity and hip condition impact the conclusion as to whether Catania's condition meets the listing. The record indicates that Catania is morbidly obese, and the Seventh Circuit has observed that an ALJ should consider a claimant's obesity in relation to his other impairments. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). The Seventh Circuit has further emphasized that "the combination" of a claimant's mental and physical problems "might be totally disabling," even if each problem analyzed separately is not serious enough to constitute a disability. *Id*. The ALJ's opinion does not analyze whether Catania's impairments could satisfy the listing if considered in combination, and on remand, his analysis should do so.

**B. Mental Limitations: Difficulties in Concentration, Persistence, and Pace**

Catania next argues that the ALJ did not properly account, in constructing Catania's residual functional capacity, for his moderate difficulties in concentration, persistence, and pace.

The VE testified that, were Catania unable to maintain a task performance of 80 percent given a lack of concentration, all available sedentary and unskilled positions would be eliminated.

The ALJ summarized the psychological examination conducted on September 11, 2008. He noted that Catania had reported feeling depressed, but that he was not in treatment for his depression. The examination indicated that Catania's concentration and attention were "grossly intact." (R. 19.) The ALJ also noted his own impression that Catania "was able to participate in the hearing closely and fully," and "to respond to questions in an appropriate manner." (*Id.*) Because of Catania's "diminished concentration," however, the ALJ limited him to performing "simple, routine and repetitive tasks." (R. 20.)

The ALJ, however, never explained the basis for a conclusion that Catania could maintain a task performance of 80 percent. The Seventh Circuit has repeatedly rejected ALJs' attempts "to account for mental impairments by restricting the hypothetical[s] to 'simple' tasks." *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009). Here, too, the court finds that the ALJ did not explain why this restriction adequately accounted for Catania's mental impairment. Much routine and repetitive work requires considerable concentration, persistence, and pace. The court therefore remands so that the ALJ can explain the basis for the conclusion that Catania could maintain a task performance of 80 percent while performing "simple, routine and repetitive tasks."

## C. Difficulty Getting Along with Others

Catania next argues that the ALJ did not account for his difficulty working in coordination with or proximity to others in determining his residual functional capacity. The ALJ noted that Catania got anxious being around other people and did not go out much, and that Catania did not receive psychiatric counseling and did not take medication for depression. The

judge gave significant weight to the state psychiatric consultant, who found that Catania's depression resulted in "mild difficulties in maintaining social functioning," in concluding that Catania did not meet the requirements for mental impairment set out in Listing § 12.04.

Having reviewed the record, the court concludes that the evidence in the record supports the ALJ's conclusion that Catania's limitations in social functioning were "mild" and that he was "able to function adequately outside the home." (R. 13.) These conclusions were supported by substantial evidence, and the court therefore affirms them.

**D. Catania's Obesity and the Combined Impact of Catania's Impairments**

The various doctors' notes and examination reports in the record largely focused specifically on one of Catania's multiple problems: his back, hip, carpal tunnel, veins, or knees. But Catania suffered from all of these problems, as well as from obesity. Catania argues that, in determining his residual functional capacity, the ALJ evaluated his different impairments individually, but did not assess how they combined to limit his functional capacity. As previously stated, an ALJ must evaluate a claimant's impairments in their totality, not in isolation. *Martinez*, 630 F.3d at 698.

The ALJ concluded that Catania had functional limitations and limited him to performing work at the sedentary level, and required that he have the option of standing or sitting at will. The opinion suggests that the ALJ, in so limiting Catania's residual functional capacity, did consider the combined impact of Catania's impairments. Nonetheless, the court finds several flaws in the ALJ's analysis.

First, the ALJ accorded significant weight to the ALJ's conclusion that Catania engaged in a "fairly extensive range of daily activities," including feeding and attending to his three-month-old baby. (R. 19.) Based on these activities, the ALJ concluded that Catania was not

precluded from working. (*Id.*) But the daily activities in which Catania engaged do not suggest that his functional capacity was such that he could steadily work for an eight-hour day. He testified that he spends most of the day watching television, does no cooking other than microwaving or making a sandwich, does no laundry or household chores, and rarely leaves the house. He only shops when using an electric cart. The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy*, 2013 WL 197924, at *7. Like the claimant in *Roddy*, Catania testified that he struggled with even the simplest household activities. Moreover, the ALJ did not consider the effort required for Catania to perform even simple daily tasks, or how he managed to cope with those tasks, such as by laying the baby on the couch for feedings rather than holding it, and by cradling it in his arms rather than holding it with his hands. On remand, the ALJ should consider Catania's testimony as to *how* he copes with his daily activities, and whether this supports the conclusion that Catania can in fact complete an eight-hour work day. *See Craft*, 539 F.3d at 680.

**E. Catania's Bilateral Carpal Tunnel Syndrome.**

Catania argues that the ALJ failed to consider his severe bilateral carpal tunnel syndrome when concluding that his residual functional capacity allowed him to perform jobs that involved frequent reaching and fingering with his right hand. The court agrees. The ALJ's opinion discussed the fact that Catania suffered pain and loss of feeling in his fingers, and cited the notes from Dr. Cohen. (R. 14, 18.) The ALJ then concluded that Catania could reach and finger frequently, but not continuously, with his right hand. (R. 20.) The ALJ did not discuss why he concluded that Catania could perform "frequent," rather than only "occasional" reaching and

fingering. The VE testified that if Catania could only perform "occasional" reaching and fingering, there would be no jobs available for him in the regional economy. (R. 58.)

Based on the ALJ's opinion, the court cannot understand how he came to the conclusion that Catania could successfully perform the work of a hand packager or assembler. The record shows that Catania had difficulty gripping things and had weakness in his fingers. (R. 49-50.) He had hand numbness, tingling, and pain, and was diagnosed with bilateral carpal tunnel syndrome. (R. 492, 494.) Surgery on both wrists was recommended, but at the time of the ALJ hearing, no surgery had been scheduled because Catania had to first recover from his hip surgery, and he needed the use of his hands. The ALJ did not address whether he believed that carpal tunnel release would relieve Catania's symptoms, and it is unclear to the court based on the current record whether Catania has been able to have the surgery, or if the ALJ's decision was based on the assumption that Catania would actually have the surgery. Whether a carpal tunnel release was successful could have a significant bearing on the question of whether Catania can in fact perform "frequent" reaching and fingering.

As stated above, the ALJ "was required to provide 'an accurate and logical bridge' between the evidence and his conclusions." *Roddy*, 2013 WL 197924, at *5 (citing *Craft*, 539 F.3d at 673; *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)). Given the absence of any explanation for the ALJ's finding, the court concludes that the ALJ's finding that Catania could perform "frequent" reaching and fingering was not supported by substantial evidence, and remands for further explication of this conclusion. On remand, the ALJ should consider any updated records Catania may present as to his carpal tunnel syndrome and its treatment.

**F. Catania's Fatigue and Need to Lie Down to Reduce Pain**

Catania's final argument is that the ALJ did not incorporate into his analysis of his residual functional capacity his need to lie down and rest during the day. The court agrees that the ALJ's consideration of this evidence is insufficient. The ALJ incorporated the need to alternate standing and sitting into his conclusions as to Catania's residual functional capacity, but he did not address the evidence that Catania regularly napped during the day and sometimes had to lie down to mitigate his back pain. Apparently, the ALJ discounted Catania's testimony about these limitations, but the ALJ's only explanation for doing so is a general statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 15.) The Seventh Circuit has roundly criticized this type of "boilerplate" language. *See, e.g.*, *Martinez*, 630 F.3d at 696; *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (finding similar language to be "meaningless boilerplate" that "yields no clue to what weight the trier of fact gave the testimony").

In *Roddy*, the Seventh Circuit held that the need to lie down during the day "does not indicate an ability to work even a sedentary job full-time." *Id.* at *8. The court further emphasized, "'one does sedentary work sitting . . . but not lying down,' and no employer is likely to hire a person who must stop working and lie down two or three times a day for an hour at a time, or who requires multiple days to complete tasks other employees might finish in one workday." *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 646, 648 (7th Cir. 2012)). Similarly, in this case, the VE's testimony stated that were an individual to need to rest or lie down during the day, all available positions in the economy would be eliminated.

The ALJ's opinion does not adequately address why Catania's fatigue and back pain do not require that he lie down during the day, or how this is compatible with an eight-hour workday. On remand, the ALJ should explain the basis for his conclusion that Catania does not need to rest or lie down during the day, taking into consideration the court's previous comments as to the significant limitations under which Catania performed his daily activities.

## V. CONCLUSION

The court concludes that Catania has shown that the ALJ failed to adequately conduct the required five-step analysis. Although his motion for summary judgment is denied, his alternative motion to the remand the case to the Social Security Administration is granted. The case is remanded for further proceedings consistent with this opinion.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 4, 2013